AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
## for the

FILED 16 APR '14 11:45USDC-ORP

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. |
| JOHN MICHAEL KEATING | ) | **'14 -MJ- 57** |
| | ) | |
| | ) | |
| | ) | |

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ March 24, 2014, _____ in the county of _____ Multnomah _____ in the
_____ District of _____ Oregon _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 USC 2315 | Receipt of stolen property |

This criminal complaint is based on these facts:

See attached affidavit

☑ Continued on the attached sheet.

_____
*Complainant's signature*

__John Bennett, Detective, Washington Cty Sheriff__
*Printed name and title*

Sworn to before me and signed in my presence.

Date: April 16, 2014

_____
*Judge's signature*

City and state:    Portland, Oregon

__Hon. Janice M. Stewart, US Magistrate Judge__
*Printed name and title*

STATE OF OREGON                          )
                                         )          ss. AFFIDAVIT OF JOHN BENNETT
COUNTY OF MULTNOMAH                      )

I, John Bennett, being duly sworn, depose and say:

## **INTRODUCTION AND AGENT BACKGROUND**

I am a Detective for the Washington County Sheriff Office, State of Oregon. I have worked as a Deputy Sheriff and/or Detective for over eleven (11) years. I am a graduate of the Oregon Department of Public Safety Standards and Training (DPSST) Police Academy, and I currently hold an Advanced Police Certification. I have received over 2200 hours of formal law enforcement training from DPSST, Washington County Sheriff's Office, Portland Police Bureau, Federal Bureau of Investigations (FBI), Drug Enforcement Administration (DEA), Oregon State Police, Midwest Counterdrug Training Center (MCTC), California Narcotics Officers Association (CNOA), Oregon Narcotics Officers Association (ONEA), Portland Community College, and other institutes and training facilitators. I am currently assigned to the Washington County Sheriff's Office Property Crimes Unit and Major Crimes Team. I have conducted numerous investigations related to fraud, theft and identity theft. I have authored several affidavits in support of, applied for, and received several search warrants at the state and federal level in Oregon. I have learned through my training and experience as a Deputy Sheriff / Detective that criminal investigations are most often conducted using a variety of investigative techniques that may include, but are not limited to, the following:

      I.  Interviews of victims, witnesses, and suspects who possess knowledge of the crime(s) being investigated.

      II.  The use of information provided by identifiable private citizens who are not involved in criminal activity and are not Confidential Informants.

      III.  The use of information provided by confidential sources who have knowledge of specific criminal acts and those involved in criminal activity.

IV. The use and analysis of information and documents provided by private corporations that are related to suspects, suspect financial information, suspect addresses, suspect credit card information and the like.

V. A review of law enforcement records and files, that may include, but are not limited to:

   a. Evidence seized in prior investigations;

   b. Intelligence reports;

   c. Records of convictions; and

   d. The personal or accumulated knowledge and analysis of other trained law enforcement officers.

The information in this affidavit is based on my personal knowledge, information provided to me by other law enforcement officers, witnesses, and individuals, and my review of bank records and other evidence collected during this investigation. The information contained in this affidavit is not a complete statement of all facts related to this case, but is provided for the limited purpose of establishing probable cause that JASON MICHAEL KEATING (hereinafter referred to as KEATING) has committed criminal violations of, *inter alia*, section 2315 of Title 18 of the United States Code.

## STATUTORY AUTHORITY

Section 2315 of Title 18 of the United States Code makes it a federal felony to receive, possess, or sell stolen property and merchandise worth $5,000 or more that has traveled in interstate or foreign commerce after being stolen, knowing the same to have been stolen, unlawfully converted, or taken.

## DETAILS OF THE INVESTIGATION

On or about February 14, 2014, at about 1:30PM I met with and spoke to the Director of Security for Nike, Greg Fowler. This meeting took place at the Nike World Headquarters, located at 1 Bowerman Drive, Beaverton, Oregon. This meeting was to discuss an internal investigation conducted by Fowler, his staff, and a State-licensed private investigative firm. Fowler told me

the investigation revealed an ongoing, large-scale theft by Nike employee TUNG WING HO (hereinafter referred to as HO) and former Nike employee KYLE KEOKI YAMAGUCHI (hereinafter referred to as YAMAGUCHI).

Fowler told me that Nike security staff believes (and has evidence to conclude) that HO is causing limited pre-production runs of Nike shoes to be produced, stealing them from Nike's campus, and then selling or transferring the stolen shoes to a third party to be sold for his own personal financial gain. Fowler indicated that the sale of pre-production or sample Nike shoes is strictly prohibited by Nike. Fowler and I also discussed specific details about HO and his employment with Nike.

Fowler told me that HO has worked for Nike since 2005. Fowler reported that TUNG WING HO has held the position of "Promo Product Manager" since 2012, when he succeeded YAMAGUCHI. Fowler told me that YAMAGUCHI left Nike to pursue his own business venture. Fowler told me YAMAGUCHI was instrumental in HO's appointment to be Promo Product Manager.

Fowler told me that, in HO's current position, he has the ability and authority to cause orders to be placed for sample shoes directly and indirectly (through other staff). Fowler explained that sample shoes are known as "Look See" shoes. Fowler said Look See shoes are limited pre-production versions of Nike shoes manufactured for use in the design process. Fowler explained that only a small number of Look See shoes are ordered and produced for a given design. Fowler

said each pair of such shoes is assigned a unique "Bill of Material" (hereinafter "BOM") number, which is displayed on the label, tag, and/or box for each of pair of shoes.

Fowler told me Look See shoes are often created for versions of a Nike shoe that never go into production. Fowler explained that these Look See shoes are extremely rare and, as a result, have become highly sought after by sneaker collectors. I know from my training, experience, investigation, and research that rare, unworn Nike shoes can command prices ranging from $1,000 to more than $20,000 from collectors. Fowler told me that HO and YAMAGUCHI were never and have never been authorized to remove Look See shoes from the Nike World Headquarters Campus to sell for their own profit or gain.

During my meeting with Fowler, he provided me with several pieces of evidence to include (but not limited to):

   a. Still pictures taken from Nike World Headquarters Campus surveillance video;

   b. Covert video surveillance of HO off of the Nike Campus at a self-storage facility in Portland, Oregon placing several Nike shoe boxes into storage;

   c. Email correspondence written by HO and YAMAGUCHI on Nike's corporate email system to various people not employed by Nike;

   d. Identifying information related to HO, YAMAGUCHI, their residences, vehicles, and businesses.

   e. Records of several Look See orders made by HO and/or YAMAGUCHI.

   f. Social media information related to HO and YAMAGUCHI.

   g. Articles from "Sneaker" trade/enthusiast websites related to YAMAGUCHI.

CRIMINAL COMPLAINT AFFIDAVIT OF DET. JOHN BENNETT — 4
United States v. Jason Michael Keating

On February 17, 2014, I reviewed the above-described still pictures taken from Nike World Headquarters Campus' video surveillance system. In viewing these images I saw whom I recognized to be HO exiting the Nike World Headquarters Campus on numerous occasions between November 21, 2013, and February 3, 2014. I reviewed images from thirteen (13) separate dates and times during this period where I saw HO exit the Nike World Headquarter Campus with what appear to be stolen Nike Look See shoes.

On March 4, 2014, I received additional video surveillance taken from Nike World Headquarters Campus's video surveillance system. In viewing these images I saw HO taking Look See shoes from the Nike World Headquarters Campus on several occasions between February 12, 2014, and March 3, 2014. I saw that HO was captured on video placing Nike Look See shoes in a large camouflage patterned gym bag at his desk. I then saw HO carry the camouflage bag to his vehicle, place the bag in the vehicle, and drive out of the parking garage.

In addition I also viewed video taken by the private investigations firm retained by Nike to assist with this case. In this video dated March 3, 2014, I saw HO again at the self-storage facility located in Portland, Oregon. I saw HO arrive in his vehicle by himself and unload several large boxes from the vehicle's passenger compartment and trunk. I then saw HO take the boxes inside the storage facility and return empty-handed. Based on this investigation and additional evidence and surveillance, I believe that those boxes contained Nike Look See shoes that HO stole from the Nike World Headquarters Campus.

On March 7, 2014, I spoke to John Gutierrez who is an investigator for JPMorgan Chase Bank via telephone. Gutierrez told me that he had conducted an investigation between November 2012 and July 2013 involving HO, YAMAGUCHI, and KEATING. Gutierrez told me his investigation was started because of frequent and large cash deposits and fund transfers from KEATING's account at JPMorgan Chase Bank to YAMAGUCHI's personal JPMorgan Chase Bank account. Gutierrez told me these transfers and deposits were made from different locations in California, Florida, New York, New Jersey, and Oregon, and involved an aggregate amount of $221,320.

Gutierrez told me JPMorgan Chase Bank made contact with YAMAGUCHI and inquired about his relationship to KEATING and the source of his deposits, and his reason for issuing checks to the same third party. Gutierrez reported that YAMAGUCHI stated that KEATING was paying YAMAGUCHI for a large shoe collection that YAMAGUCHI was selling on behalf of a third party. YAMAGUCHI further stated KEATING would purchase inventory from him (YAMAGUCHI) and then resell the shoes to small boutiques in California, Oregon, Florida, New York, and New Jersey.

Gutierrez told me funds exited YAMAGUCHI's JPMorgan Chase account between November 2012 and March 2013 primarily in the form of checks written to "Tung Ho." Gutierrez said thirteen (13) checks were written to HO from YAMAGUCHI during this time period, totaling $104,000.

CRIMINAL COMPLAINT AFFIDAVIT OF DET. JOHN BENNETT — 6
United States v. Jason Michael Keating

On March 14, 2014, a search warrant was executed at HO's residence in Portland Oregon. During the search of HO's residence 1,941 pairs of Nike Shoes were seized along with a large sum of United States Currency. I spoke to HO at his residence about this investigation. Prior to speaking to HO he was read his *Miranda* warning. No promises of leniency or threats of punishment were made to HO. HO agreed to speak to me about this investigation.

I began by explaining to HO that based on my investigation I believed that he had stolen Look See shoes from Nike and sold them for his personal profit. Ho admitted that he had stolen several hundred pairs of Nike Look See shoes and sold them in two (2) different ways. HO said that he personally had used EBay to sell shoes on a small scale, earning approximately $15,000. HO told me the other way he sold Nike Look See shoes was by using a "middle man": YAMAGUCHI. I asked HO to explain how the process of selling the Nike Look See shoes took place.

HO told me he would order the Nike Look See shoes From the factory in China using Nike's automated ordering system and have them shipped to him. HO said he would then communicate with YAMAGUCHI via phone, email, text, or in person and negotiate a price for a specific lot of Nike Look See shoes. HO told me once a price was agreed upon he would give the Nike Look See shoes to YAMAGUCHI who would then ship the Nike Look See Shoes to his (YAMAGUCHI's) buyer. HO told me he did not know who YAMAGUCHI sold the Nike Look See shoes to, but he knew the majority were sent to a buyer in Florida who would then sell the Nike Look See shoes to small boutiques and shops around the United States. I asked HO if he knew KEATING and he said he did not. HO told me once the Nike Look See shoes were shipped

he would receive a cash payment or cash wire transfer from YAMAGUCHI within approximately two (2) weeks.

On March 20, 2014, I spoke to YAMAGUCHI about this investigation. YAMAGUCHI was aware of this investigation and the execution of the search warrant at HO's residence. YAMAGUCHI told me that he was HO's "middle man" and brokered the sale of Nike Look See shoes that HO had stolen from Nike for 20% of the total profit of the sale. YAMAGUCHI said that KEATING was the largest purchaser of Nike Look See shoes that he (YAMAGUCHI) received form HO. YAMAGUCHI confirmed that KEATING lives in Florida with an address of 3515 W Gulf Drive, Sanibel, Florida, 33957.

YAMAGUCHI explained that KEATING typically pays for the stolen Nike Look See shoes by means of in-person cash transactions or wire transfers into YAMAGUCHI's JPMorgan Chase account. YAMAGUCHI told me when KEATING pays in cash he usually travels to Portland, Oregon, to complete the transaction. YAMAGUCHI said the payments from KEATING typically range from $5,000 to $30,000, and sometimes more. YAMAGUCHI told me for larger payments KEATING will travel to Portland, Oregon, and make cash withdrawals from several different bank branches to amass the total amount of cash needed to complete the transaction. I know from my training and experience that those involved in illicit activity will often use structured cash withdrawals or deposits like YAMAGUCHI described in an attempt prevent suspicion by financial institutions and law enforcement. YAMAGUCHI told me that, after KEATING makes payment of the agreed-upon price, the Nike Look See shoes are shipped from Oregon to KEATING in Florida, and he sells them to various buyers.

CRIMINAL COMPLAINT AFFIDAVIT OF DET. JOHN BENNETT — 8
United States v. Jason Michael Keating

On March 24, 2014, Secret Service Agent Morgan West and I met with and a Confidential Source (hereinafter referred to as CS) in Portland, Oregon. The CS had arranged to meet with KEATING in a public business in Portland, Oregon. Prior to CS meeting with KEATING the CS and the CS's belongings were searched. CS did not have a large amount of US Currency or contraband on the CS or in his belongings. It should be noted that CS was kept under constant visual and audio surveillance before, during, and after meeting with KEATING. I listened remotely as CS met with KEATING.

I heard CS meet with KEATING and exchange greetings. During the course of the conversation between KEATING and CS, I heard them talking about their transaction for Nike Look See shoes. I heard KEATING and CS discuss the recent law enforcement activity surrounding HO. At one point during the conversation I heard KEATING tell CS something to the effect that he (KEATING) had destroyed the evidence, referring to boxes used to ship stolen Nike Look See shoes to KEATING. During the meeting between KEATING and CS, they also discussed future shipments of other stolen Nike Look See shoes. During this meeting with the CS, KEATING paid the CS a large sum of money in cash for a pending order of stolen Nike Look See shoes. At the conclusion of the meeting CS and KEATING parted ways.

After CS separated from KEATING, Agent West and I maintained audio and visual surveillance of CS and re-contacted CS after KEATING left the area. It should be noted that CS did not make contact with anyone else and did not enter any other location after meeting with KEATING. CS,handed me a bag given to CS by KEATING. I looked in the bag and saw what I recognized

CRIMINAL COMPLAINT AFFIDAVIT OF DET. JOHN BENNETT — 9
United States v. Jason Michael Keating

to be US currency, which was later counted and determined to be more than $20,000. Agent West and I then debriefed CS about the meeting.

CS told us that the money KEATING gave CS during this meeting was for stolen Nike Look See Shoes. CS said that KEATING was not apprehensive at all and did not appear to be concerned about the law enforcement activity involving HO. CS told us that CS got the impression that KEATING was going to meet with other potential suppliers of stolen Nike shoes during this trip to Oregon. CS told us CS believed that KEATING had additional suppliers who are current Nike employees. It should be noted that CS was again searched after meeting with KEATING, but nothing new was recovered.

## CONCLUSION

Based on the foregoing facts, your affiant has probable cause to believe, and does believe, that JASON MICHAEL KEATING has committed the crime of Receipt of Stolen Goods, in violation of Section 2315 of Title 18 of the United States Code in the District of Oregon and elsewhere. He committed these crimes by:

Causing stolen merchandise worth approximately $20,000 to be transported or transferred to him in interstate or foreign commerce, knowing the same to have been stolen.

///

///

///

///

CRIMINAL COMPLAINT AFFIDAVIT OF DET. JOHN BENNETT — 10
United States v. Jason Michael Keating

I swear under penalty of perjury that the above facts are true and correct to the best of my knowledge.

JOHN BENNETT
Detective
Washington County Sheriff's Office

Subscribed and sworn to before me this ⁄⁄⁄ day of April, 2014.

THE HONORABLE JANICE M. STEWART
United States Magistrate Judge

CRIMINAL COMPLAINT AFFIDAVIT OF DET. JOHN BENNETT — 11
United States v. Jason Michael Keating